**People of the State of Illinois, Plaintiff-Appellee, v. Willie Irvin, Defendant-Appellant.**

Gen. No. 52,044.

First District, Fourth Division.

December 31, 1968.

Gerald W. Getty, Public Defender of Cook County, of Chicago (Harold A. Cowen, Norman W. Fishman, and James J. Doherty, Assistant Public Defenders, of counsel), for appellant.

John J. Stamos, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and John M. Goldberg, Assistant State's Attorneys, of counsel), for appellee.

MR. PRESIDING JUSTICE McCORMICK delivered the opinion of the court.

WILLIE IRVIN, defendant, was convicted of the murder of Lena Shelly and an aggravated assault on James T. Shelly, and was sentenced to the penitentiary for not less than fifteen nor more than twenty-five years for murder, and not less than five nor more than ten years for aggravated battery. This appeal is taken from the judgment of the court.

The State's first witness was James W. Harris, who testified that he lived at 3950 Indiana Avenue; that on July 26, 1965, at about 2:00 a. m., he was sitting on the front porch with Lena Shelly (deceased); she was sitting on the banister leading to the basement. He heard shots down the street and saw the defendant, Willie Irvin, and his wife each fire a shot, after which he saw the wife

hand the gun to the defendant, who put it in his right-hand pocket with a handkerchief. About 15 or 20 minutes later the defendant and his wife came to the porch where the witness was talking with the deceased and the deceased's father who had just joined them. The defendant pushed the deceased with his finger and said, "Don't you like it?" She replied, "Not particularly," and he said, "I'll blow your brains out." He then shot her in the head. The deceased had not moved from the banister before the shooting, nor had she touched the defendant. After she was shot she "made a funny little noise and fell." The witness then ran upstairs, looked out the window and saw the deceased's father hitting the defendant with a shiny object which the witness identified as People's Exhibit 2, a metal vacuum cleaner pipe. He stated that he then heard a couple of shots fired, but did not see who fired them. The witness testified that he had once been sentenced to the penitentiary for armed robbery.

J. T. Shelly testified for the State that he was the father of the deceased; that on July 26, 1965, he arrived home from work about 3:00 a. m., and saw the defendant and his wife standing near their truck which was parked up the street from the building at 3950 Indiana Avenue. He sat on the porch talking with Harris and his daughter; at this time the defendant came up to the porch with his wife who was holding on to his side; he pulled loose from her, reached over and hit the deceased and asked her if she liked it. She said, "not particularly, because she didn't feel good." At that time the gun went off, and the defendant said, "Now, take that." Shelly then went into the house, got the metal pipe and met the defendant in the hallway. He hit the defendant with the tubing and the defendant said he would kill him if he hit him again. He dropped the tube and the defendant fired two shots at him, hitting him in the back. Shelly saw the weapon after the defendant shot him. Shelly and his wife then

went to see what they could do for their daughter, but she was dead, having been shot through the left side of her head.

Jessie Hewing testified that he was visiting with two girls at 3950 Indiana Avenue on July 26, 1965; that he looked out the window and saw the defendant and a woman walking down the street; that he heard a shot and saw the deceased fall off the banister. He then saw Shelly come out with some object in his hand and hit the defendant; another shot was fired, and he heard Shelly say to the defendant that he had shot his daughter. He saw the two men tussling together, but when he got there the defendant had gone. On cross-examination Hewing stated that he had testified at the Coroner's inquest where a court reporter was present, and that he was examined as follows:

"Q. Did he have a gun in his hand at that time?
"A. No. I couldn't see a gun in his hand. Evidently, he must have put it in his pocket or something."

He was then asked if he gave that answer and he said, "I don't remember giving that statement." He said when the man was walking towards him and towards the building he couldn't see the gun; that he didn't see it anymore until after the girl fell. No record of testimony before the Coroner was introduced, and the impeachment falls flat.

Police Officer Robert O'Donnell testified for the State that on the day and time in question he went to the premises and saw the deceased lying on the steps; she had been shot on the left side of the head and was dead. He talked to Shelly who had a bullet in his back. He stated that he picked up a vacuum cleaning tube from the sidewalk which he had brought to court with him.

Richard Degitis testified for the State that he was a detective for the Chicago Police Department assigned to

320

the homicide squad; that he investigated the shooting in question, and had a conversation the next day with Alline Smith, sister of the defendant.

It was then stipulated that if the Coroner's physician were called to testify he would state that on July 26, 1965, he examined the body of Lena Shelly (deceased); that he observed a gunshot wound as follows: Entry in the left temporal area directed slightly obliquely upward and to the right passing through left temporal lobe and the mid aspect of the right temporal lobe, where the metallic pellet was recovered. In the opinion of the Coroner's physician, death was caused by a gunshot wound of the brain. The witness also testified that the bullets fired at both the deceased and Shelly were submitted to the Coroner's office, and in the opinion of the examiner, the bullets were fired from the weapon in evidence.

Willie Irvin, the defendant, testified that he had known J. T. Shelly six or seven years, and also knew his daughter, the deceased; that on July 26, 1965, he was in front of 3950 Indiana Avenue. His wife, his sister, Alline Smith, and he went there together in his sister's car, after having been to a place called Turner's in the 4000 block on Indiana, and to a Walgreen's drugstore at 35th and South Park. He played the drums and guitar with a band at Turner's. He stated that he had nothing alcoholic to drink that evening. When they arrived at 3950 Indiana, his sister went into her first-floor apartment; the defendant unlocked the trunk of his car and took out the gun which was in evidence. He said he did not want to leave it in the trunk overnight; he denied that the gun was fired at the truck location, either by him or his wife. He testified that he saw Lena Shelly (deceased), her father, and James Harris on the porch; that the deceased was on the railing to the north of the concrete steps. He stated that she asked him to lend her some money; he said he did not have

any, and the deceased then hit his pocket; he told her not to do that, that there was a gun in there. She put her hand in his pocket, then pulled it out, and the gun came out with it; she grabbed him with her other hand and the gun went off. He testified that the deceased was falling and dropped the gun, and he picked her up and also picked up the gun and put it in his pocket. He stated that Shelly, the deceased's father, then attacked him with a pipe, and the defendant grabbed him, wrestling with him in the hall, then out the door onto the sidewalk. He testified that Shelly continued hitting him with the pipe; that he told him not to hit him again, and pulled the gun out of his pocket, firing it into the ground. The defendant stated that Shelly then swung at him and the gun went off again; the defendant ran north, together with his wife, to his cousin's house where they stayed overnight. The next day he went to the police station with the gun and reported what had happened the night before. He told them he had found the gun, because he did not want to admit owning it since it was not registered.

On cross-examination defendant stated that when the deceased put her hand in his pocket he "probably gave her the lift out, because I pulled up like this at her wrist, here." He denied that he was holding the gun at the time it was fired. The State's Attorney then asked him about the statement he made to the police when he gave himself up. He was asked:

"Q. Do you remember being asked this question and making this answer: 'Q. What happened to the gun—after Lena Shelly got shot? A. She pulled the gun out and I grabbed it. And I don't know how it discharged, if her fingers hit it or my fingers hit it.'

"Q. Do you remember being asked that question and making that answer?

322

"A. Yes, I remember saying that I grabbed at the gun."

The State's Attorney then asked him:

"Mr. Irwin, did you tell the police in your written statement: A. She pulled the gun out and I grabbed it?' Do you recall telling the police that after your arrest?

"A. I grabbed her arm.
"The Court: Yes or no.
"A. Well, yes, I might have told the police that. I might have told them that. I'm not sure. I didn't read the statement after he made the statement, because I didn't have no glasses."

Alline Smith testified that she lived at 3950 Indiana Avenue in a first-floor apartment, and that she is the defendant's sister. She testified that on July 26, 1965, she had been at Turner's Lounge with her brother and his wife. Her brother, the defendant, was playing in the band that evening, and she did not see him drink anything. She said that she drove them in her car to a Walgreen drugstore, then to her home, after which the defendant and his wife went to their truck, and the witness went into her apartment and opened the window. She did not know what the defendant did at the truck which was parked opposite her window. She testified that when they reached the building at 3950 Indiana Avenue, James Harris and the deceased were out in front; that about five minutes after she went into her apartment she heard voices on the porch, then a noise like a firecracker; she was looking out the window and saw the deceased fall. She stated: ". . . her hand went up and one of his hands, and there was something; but it was done so fast and so quick . . . ." The witness further testified that she saw the defendant pick up the de-

ceased, then saw Shelly come out and start hitting the defendant with a pipe; that while the two men were fighting she did not see anything in the defendant's hand. She stated that the defendant ran; Shelly overtook him and kept hitting him; then a shot was fired "into the ground," and the defendant got away; she did not know if other shots were fired afterward. She thought the deceased had said something to the defendant about two dollars, and about buying her a drink.

Sharon Irvin, defendant's wife, testified that she lived at 3929 Indiana Avenue with her husband and her mother-in-law. She stated that she was hard of hearing; that she knew the deceased. On July 26, 1965, she was at Turner's Lounge with her husband and his sister, where they stayed until closing at about 2:00 a. m. She drank no intoxicating liquor. Her sister-in-law drove them to a Walgreen drugstore at 35th Street and South Park to purchase Maalox, then drove them to 3950 Indiana; there the witness and the defendant stopped at their truck and he took something from it, but the witness did not know what it was. She stated there was no exchange of any gun between them, nor did she see a gun. At the front of the building she saw James Harris, Lena Shelly (deceased), and the deceased's father; the two men were seated, and the deceased was standing near the rail. The deceased asked the defendant if he had any money and put her hand in his right-hand pocket; at that time the defendant raised one hand; the pistol went off, and the deceased fell. The defendant started to pick her up when Shelly came out of the building with a pipe and the two men started fighting and rolling into the street; the defendant got up and fired the pistol into the ground; the witness thought he fired another shot, but she did not see it fired; after that the defendant ran up Indiana Avenue and the witness followed him. They went to the defendant's cousin's home on St. Louis Avenue.

State's witness, Officer Robert O'Donnell, testified in rebuttal that he had talked to Mrs. Smith, who said she was the defendant's sister, and that she did not know anything about what happened outside the building on the night in question.

■ OPINION: In this court the defendant first argues that he was not proved guilty of murder beyond a reasonable doubt, and claims that the State, through its witnesses, revealed no motive for the defendant to murder the deceased. However, the State cites and quotes from People v. Doody, 343 Ill 194, 175 NE 436, where the court stated that the prosecution need not prove motive of crime where a deliberate criminal act is established. In People v. Corder, 306 Ill 264, at 277, 137 NE 845, the court said:

"In a criminal prosecution the People are required to prove the commission of an act forbidden by law and to prove it beyond a reasonable doubt, but they are never required to prove the cause or reason that induced the accused to commit such act if without such proof the evidence is sufficient to show that the act was done by him. If the accused committed the act, the question whether he had a motive, or what it was, is immaterial. (People v. Enright, 256 Ill 221.)"

In ILP, Criminal Law, § 21.40, the rule is laid down that

"Motive is not an essential element of a crime.

"Although motive is frequently an important element in the case of the prosecution, the state is not required to prove a motive for the crime, if without this, the evidence is sufficient to show that the act was done by the accused."

The defendant cites People v. Meyer, 331 Ill 608, 163 NE 453, which is inapplicable because there the Supreme

Court held that the shooting was not deliberate, while in the instant case the State's eyewitness testified that defendant said to the victim, "I'll blow your brains out."

In the instant case the defendant further argues that since Harris was the only witness to testify he saw the defendant holding the gun, the introduction of Harris' prior conviction impeached him. That, of course, is not the law. The only effect of the prior conviction would be to permit the jury to consider that fact in determining the credibility of that witness, and the jury was so instructed. The credibility of the witness is a matter for the jury. People v. Jones, 24 Ill2d 71, 179 NE2d 620; People v. Van Dyke, 414 Ill 251, 111 NE2d 165.

The defendant argues that the wound in the left temple of the deceased "with the bullet traversing a slightly upward direction is compatible with the theory of accident but is incompatible with the known fact that there was a standing defendant and a sitting victim on a side of him at the moment of the shooting." Defendant's speculations as to the course of the bullet seem specious since the jury evidently believed from the evidence that the shooting was deliberate.

The requirement that guilt of the defendant be proved beyond a reasonable doubt does not mean that the trial judge or jury, as the case may be, must disregard inferences that naturally flow from evidence, and the trier of fact is not required to search out the series of potential explanations compatible with innocence and elevate them to the status of reasonable doubt. People v. Beckham, 71 Ill App2d 357, 219 NE2d 139.

The mere fact that there was conflicting testimony or alternative explanations of conduct is not incompatible with proving the defendant guilty beyond reasonable doubt. People v. Hatch, 49 Ill App2d 177, 199 NE 2d 81. Where there is conflict in evidence, conclusions and inferences to be drawn therefrom rest completely

upon which witnesses the jury chose to believe. People v. Galloway, 28 Ill2d 355, 192 NE2d 370. The jury chose to believe the State's witnesses. Rejection of the defense's witnesses does not create a reasonable doubt. The State's evidence was not so unbelievable or unreliable as to create a reasonable doubt.

██ ██ Unless there is reasonable doubt as to defendant's guilt based upon the evidence, the judgment should be affirmed. People v. Williams, 17 Ill2d 193, 161 NE2d 295. In the instant case the defendant was properly found guilty of murder beyond a reasonable doubt.

In this court it is argued that the trial court should have directed a verdict for the defendant on a charge of aggravated battery by the defendant on J. T. Shelly. Section 7–1, c 38, Ill Rev Stats 1967, provides:

"A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony."

██ ██ Without again reciting the evidence, it is apparent that Shelly, immediately after seeing his daughter killed, went to his apartment and brought out a piece of hollow aluminum tubing with which he struck the defendant. He dropped the tubing in a struggle with the defendant; he picked it up and the defendant drew his gun, telling Shelly he was going to kill him if he hit him again. It would appear that the defendant was not justified in believing that he was in danger of death or great bodily harm. The question is one of fact and not

of law. The court properly denied defendant's motion for a directed verdict. Shelly did not attack the defendant with a deadly weapon, nor is there any showing in the record that the defendant received any harm whatsoever from being hit with the tubing. The State proved the case of aggravated battery on Shelly by the defendant beyond a reasonable doubt.

It is argued that the prosecutor suggested that the testimony as to the silence of Alline Smith, sister of defendant, immediately after the incident, and her statement that she knew nothing of what occurred, was improper. There was no suggestion that her silence was proof of the guilt of the defendant. The only purpose of the impeachment was to shed doubt upon her testimony.

The defendant also argues that the prosecutor improperly used evidence of defendant's prior conviction for other than impeachment purposes. Evidence was introduced that the defendant had formerly been convicted for assault and robbery in the State of Wisconsin. The argument of the State, while not proper, did not constitute reversible error. Other statements made by the State's Attorney are also argued to be improper. We find no merit in these contentions. The defendant was properly convicted beyond a reasonable doubt of aggravated assault on Shelly.

The judgment of the Circuit Court is affirmed.

Affirmed.

DRUCKER and ENGLISH, JJ., concur.