The People of the State of Illinois, Plaintiff-Appellee,
v. Eliseo Gonzales, Defendant-Appellant.

Gen. No. 10,853.

Fourth District.

March 6, 1969.

Joseph W. Maddox and Richard J. Cadagin, of Springfield, for appellant.

Raymond L. Terrell, State's Attorney of Sangamon County, of Springfield (Richard A. Hollis, First Assistant State's Attorney, of counsel), for appellee.

SMITH, J.

A jury found the defendant guilty of murder and he was sentenced to the penitentiary for a term of not less than 40 nor more than 70 years. He prosecutes this appeal charging (1) that statements made to police officers were received into evidence without adequate proof that the defendant had been advised of his constitutional rights, (2) that a list of witnesses furnished the defendant five days prior to the trial precluded testimony of such witnesses at the trial, (3) that evidence showing that the defendant had been convicted of a misdemeanor was erroneously admitted, (4) that certain items of evidence and exhibits were received into

evidence without connecting them with either the crime of the defendant or the deceased, (5) the cross-examination was unduly restricted, and (6) that the court's instruction concerning the degree of proof required for circumstantial evidence was erroneous.

 The death of Nellie Wells by means of multiple stab wounds took place in the late evening hours of October 18, 1965, or the early morning hours of the next day. On October 19, a warrant for the arrest of the defendant was issued. The interviews and the statements to which complaint is directed took place in April, 1966. Miranda v. State of Arizona, 384 US 436, 84 S Ct 1602, 16 L Ed2d 694, was decided June 13, 1966. The instant case went to trial on July 12, 1966. Thus, as announced in Johnson v. State of New Jersey, 384 US 719, 86 S Ct 1772, 16 L Ed2d 882, the format as to in-custody interrogation applies. The trial court suppressed many of the statements which had been reduced to writing, but permitted police officers to testify as to the statements after refreshing their recollection from the reading of the same. The order suppressing the statements was based on the fact that the State had not complied with a previous order of the court to deliver them to the defendant and was not based on Miranda. The trial court specifically held that the defendant had waived his constitutional rights within the meaning of Miranda.

The evidence is clear that the defendant was released from Illinois State Farm at Vandalia, Illinois, on October 18, had a ticket to Chicago, got off in Springfield near noon, checked his duffle bag at the bus station, and spent the afternoon and evening drinking and carousing. He left Springfield that evening with a man whose name he did not know, first heading toward Chicago and ultimately turning around and passing through Springfield and on into Missouri. The driver of this car was

47

headed for San Francisco. At a stop in Missouri, this gentleman drove off and left the defendant. He called the highway patrol and they took him down to the bus station in Missouri where he slept on a bench all night and the following morning headed toward San Antonio, Texas. At Joplin, Missouri, he called his father and was in turn informed that he was wanted on a murder charge in Illinois. His father sent him $10. He then decided not to go back home and the record is silent from then on until we find him incarcerated in Baton Rouge, Louisiana. While in custody there, he told the sheriff that he "was wanted for murder in Springfield. They did not know 'til I told them." As abstracted, the defendant stated, "I talked to Captain LaBlanc in Baton Rouge freely and voluntarily about what I did in Springfield on October 18, 1965. I told him about meeting three women in Springfield. I did not know at that time I was wanted for murder, but I knew I was wanted for suspicion of murder. I knew this when I called my father while I was in Missouri. I didn't tell my father I was wanted, he already knew—he told me. He told me at this time that I was wanted for murder. I was told before by my mother. I called her." Two police officers and an Assistant State's Attorney went to Baton Rouge to return the prisoner. They first interviewed the prisoner on the evening of April 12. As abstracted, the Assistant State's Attorney stated to the defendant, "At that time, I advised him that he had a right to remain silent and that any statement that he might make could be used against him, and that he had the right to consult with an attorney. He stated that he would like to have an attorney at his trial in Springfield, Illinois. I told him he would have an attorney at his trial in Springfield, Illinois, but the question now was did he want to consult an attorney in Baton Rouge before he talked to us. He replied that he did not want an attorney in Baton Rouge, Louisiana."

48

The following morning substantially the same warnings were given to him. The defendant was asked whether or not the conversations could be taped and he responded in substance that they could, but that he would not sign anything.

During the trip back to Illinois, there was a discussion of the penalties for murder. They were explained by Mr. Olshefsky, and by the Assistant State's Attorney and the defendant was permitted to read the sections of the statute relating to them. His own testimony indicates that he made the inquiries without response to any interrogation. In fact, he testified on the trial that an inmate in Baton Rouge told him Illinois had abolished the death penalty. Both murder, voluntary manslaughter and involuntary manslaughter were explained. He stated that he wanted to see the big boy in Springfield when he got there and that he might plead guilty to a manslaughter charge. Olshefsky told him that he once had a Mexican friend who was good with a knife and asked the defendant if he was good with a knife. Defendant testified, "I told him I was good, but had never cut anybody before." Upon reaching Springfield, the Assistant State's Attorney was called and stated, "You wanted to see me, you want to make a deal?" The defendant said, "That's right, you're the man. I want to reduce the crime from murder to manslaughter." Prior to this conversation, the defendant was advised of his rights. He was advised that "he had a right to remain silent, had a right to have counsel, that if he were indigent, he had a right to have counsel appointed, and that anything he said could be used against him in a court of record." The defendant responded by saying that he had already been advised of his rights. The State's Attorney advised him that it would be impossible to reduce the charge unless he had committed a crime. Gonzales then stated that he would rather take a chance on manslaughter than gamble his life on murder. It

should be further here observed that Gonzales insisted throughout that he had not cut anyone with a knife and that he did not kill Nellie Wells and did not hurt her in any way. Every police officer testifying testified to just that. The testimony throughout is remarkably free from contradictions, but with the usual semantical variations characteristic of human expression about a single event. Gonzales testified that he had been mistreated in Baton Rouge, but repeatedly stated that he had had no mistreatment from the police officers in Springfield. He did state that he was afraid, afraid of his record and afraid of his life on a murder charge.

En route from Baton Rouge to Springfield, the party stopped at a restaurant for lunch in Memphis, Tennessee. At the back of the restaurant there was a Negro dressed in a white uniform standing near some garbage cans. He asked the defendant, "What have they got you for?" The defendant replied, "What do you get for killing a man?" The Negro replied, but his statement was not understood by the officer, and the defendant then replied, "I didn't do it." At the same time he said "I didn't do it" his face broke into a grin and he winked at the Negro. The defendant himself testified to this conversation as follows: "He asked me why they tagged me like that and I told him they picked me up for suspicion of murder. Mr. Blodgett (Assistant State's Attorney) smiled and I smiled back at him and winked. I winked at Mr. Blodgett. I never told anyone that I killed Nellie Wells or that I had hurt Nellie Wells." On April 15, they were preparing a lineup. The defendant was shown some articles of clothing at the sheriff's office, the duffle bag and in particular a shoe with the name of Gonzales on it. He denied ever having seen the duffle bag or the shoe. As they were leaving and in response to no question, Gonzales turned to the officers and said, "I will give you some food for thought. When I get mad I'm like two people. Sometimes I don't

50

know what I'm doing. I may have done this thing and not known it." The defendant did not recall these remarks.

██ ██ Miranda does not judicially paralyze an accused's vocal chords nor bar volunteered incriminating statements. It does not still the voice of conscience in a sinful soul seeking expiation. It does not compel a police officer to close his ears to self-incrimination by an accused unless the vocalization is the product of incustody interrogation absent the Miranda warning. Gonzales' own testimony that he freely and voluntarily told the Baton Rouge officers that he was wanted on "suspicion" of murder in Springfield negatived any thought that the principles of Miranda were violated in Baton Rouge. He told the Springfield officers and Assistant State's Attorney that he did not want a lawyer in Baton Rouge. In Springfield, he was given the Miranda warning before the Assistant State's Attorney would talk with him. On the record in this case, the protective cloak of Miranda is unavailing. He waived it in Baton Rouge; he was given it in Springfield; he still talked and made statements that placed him at the site of the murder and yet consistently and throughout he maintained that he had not harmed Nellie Wells. His packet of letters addressed to him at the Illinois State Penal Farm were found near her body in the alley. He told the officers and testified on the stand that he had had sexual intercourse with Nellie Wells in this same alley and awhile before had had sexual intercourse with another girl. From this record, we are satisfied that Miranda is unavailing to bar his statements.

██ Objection is made to the identification and admission of the packet of letters on the grounds that in this manner evidence of the prior conviction of a misdemeanor appears in the record to his prejudice. These letters were found near the body of Nellie Wells. Gonzales' duffle bag and its contents found at the bus

51

station in Springfield were identified by penal farm personnel. There was no evidence offered of any prior conviction. His residence at the Illinois State Farm at Vandalia, of course, does not come as a recommendation, but it is admissible to prove identity, People v. Walker, 34 Ill2d 23, 213 NE2d 552, and to show evidence directly related to the guilt of the defendant. People v. McDonald, 365 Ill 233, 6 NE2d 182. The duffle bag and the letters are circumstantial evidence of Gonzales' presence in Springfield on the night of October 18, and are certainly circumstantial evidence of his presence in the alley where Nellie Wells was slain. There was no error in the admission either of the letters or of the duffle bag or of the testimony about them.

 The indictment was returned in this case on May 3. On May 9, the court entered an order on the State to produce any statements reduced to writing and a list of witnesses to any oral statements within 15 days of the date of the order. The State did not comply with this order and on motion by the defendant any written statements were suppressed and denied admission into evidence, but the trial court did permit the police officers to examine the statements and to testify from them, but not to read from them. A list of some 62 witnesses was furnished the defendant and the last of these was not furnished until five days before the trial. It is the position of the defendant in this case that there was a deliberate attempt on the part of the State to conceal facts whenever possible and, when impossible, to release them only at the last moment, and that this conduct on the part of the State would necessarily prejudice the defendant and deprive him of a fair trial. The defendant contends that the State offended Ill Rev Stats 1965, c 38, § 114–10, which in effect holds that in a criminal case on motion of the defendant the court shall order the State to furnish the defendant with a copy of any written confession and a list of the

witnesses to its making or if there is an oral confession, a list of the witnesses to its making and no such confession shall be received in evidence where this statute has not been complied with. The court did suppress the statements and this evidence, but permitted the officers to read the statements and then testify as to what was said. This, the defendant contends, is accomplishing by indirection that which could not be accomplished directly. The difficulty with the defendant's position is that none of the statements here are properly construed as confessions. Indeed the posture of the defendant throughout has been that he did not harm Nellie Wells. A confession has been defined as a voluntary acknowledgment of guilt after the perpetration of an offense and does not embrace mere statements or declarations of independent facts from which guilt may be inferred. On the other hand, an admission is any statement or conduct from which guilt of crime may be inferred but from which guilt does not necessarily follow. People v. Stanton, 16 Ill2d 459, 158 NE 2d 47; People v. Georgev, 38 Ill2d 165, 230 NE2d 851. Coupled with this objection is an objection that the court permitted witnesses to testify whose names were not furnished by the State to the defendant until five days before the trial. The record does not show an order pursuant to Ill Rev Stats 1965, c 38, § 114-9. There was no showing of surprise or prejudice on the part of the defendant nor was a motion for continuance filed. It is well established in this State that it is within the discretion of the trial court to allow a witness to testify even though his name is not on the list of witnesses furnished to the defendant and that the burden is on the defendant to show surprise or prejudice. People v. La Coco, 406 Ill 303, 94 NE2d 178; People v. Hopkins, 29 Ill2d 260, 194 NE2d 213. We do not agree that the charge laid at the door of the State's Attorney is borne out by this record nor did it operate in any way to

deprive this defendant of a fair trial. However, prompt compliance with proper pretrial procedures on the part of litigants would avoid the introduction of unnecessary collateral issues on appeal.

 ██ The defendant complains of the following instruction on circumstantial evidence:

> "The Court instructs the jury that, while the jury must be convinced of the guilt of the defendant beyond a reasonable doubt from the evidence, the proof need not be the direct evidence of persons who saw the offense committed but may consist of circumstantial evidence.

> "Circumstantial evidence in criminal cases is the proof of such facts and circumstances connected with or surrounding the commission of the crime charged as tend to show the guilt or innocence of the party charged, and if the facts and circumstances shown by the evidence in this case are sufficient to satisfy the jury of the guilt of the defendant beyond a reasonable doubt, then such evidence is sufficient to authorize the jury in finding the defendant guilty. The law demands a conviction wherever there is sufficient legal evidence to show the defendant's guilt beyond a reasonable doubt, and circumstantial evidence is legal evidence."

This instruction the defendant says is incorrect for the reason that it sets an improper standard or level of proof required for circumstantial evidence. It is contended that the proof required for conviction by circumstantial evidence must establish the guilt of an accused so conclusively that every reasonable hypothesis of his innocence is excluded. Actually neither the instruction given nor the statement of the defense is a correct statement of the law. The instruction here given has been specifically criticized by the Supreme Court in People v. Ciucci, 8 Ill2d 619, 137 NE2d 40. This instruc-

tion was given and the court indicated that the word "demand" is entirely too rigid and that the instruction would be more accurately framed by the word "authorizes" or "warrants" and that the definition of circumstantial evidence should have been qualified to the extent that such evidence must be "strong and convincing" in character. In that case, a murder case where the death sentence was imposed, the Supreme Court nevertheless held that it was not error to give the instruction. The Appellate Court in the Fifth District had occasion to consider the same instruction in People v. Harris, 66 Ill App2d 46, 213 NE2d 588, and came to a like conclusion. We do not deem the giving of this instruction in this case an error warranting reversal nor do we believe that the verdict of the jury would have been otherwise in this case. Taking all of the instructions together there can be little doubt but that the jury was told that defendant's guilt must be established by the evidence beyond a reasonable doubt and was advised that a defendant is presumed innocent of the charge throughout the entire trial; that this presumption prevails throughout the trial and should be considered by the jury; and that a verdict of guilty should not be based upon mere probability, presumption, speculation or suspicion. We have also reviewed the other instructions at which criticism is directed and find the objections are without merit.

The defendant also has raised questions concerning the admissibility of certain exhibits and has complained that his cross-examination of certain witnesses was unduly restricted. We have carefully reviewed the record in these instances and are of the opinion that no error was committed. It would serve no useful purpose in this opinion to take each of the exhibits item by item as they all have a connection either with the physical aspects of the alley, of the body of the decedent, or otherwise. They all furnished some light upon issues in-

volved in the case and there was no abuse of discretion either in the admission or rejection of exhibits or in the cross-examination of witnesses.

A waitress in the tavern and the co-manager testified that the defendant and the decedent were in the tavern sometime after midnight October 18, and were there about closing time; that they were drinking Falstaff beer; that they were fussing because of some remark that Nellie Wells had made about the defendant's nationality, and testified they appeared to be angry. They left the tavern together and Nellie Wells had a partially filled Falstaff bottle in her hand. A partially filled Falstaff bottle was found near the body. A merchant testified that Gonzales purchased a knife the afternoon preceding this occurrence and identified Gonzales. Louise Miller testified that a knife was exhibited by Gonzales to her when they were out to lunch earlier in the evening and that they had a slight scuffle and she cut herself on the knife. Gonzales testified that he and his friend departed for Chicago somewhere around 10 or 11 o'clock. The other witnesses, including a taxi-driver, the co-manager, and a waitress testified that Nellie Wells and Gonzales were in the tavern at its closing time and were directed to leave. Sometime around 2 or 2:30 a neighbor lady heard a woman scream and looked out, but was not able to see anything. It is clear that the finger of suspicion pointed to Gonzales in this case and a warrant was issued the following morning for his arrest. The packet of letters was found near the body. The Falstaff bottle partially filled was found near the body. Death was a result of multiple stab wounds. When confronted with his own duffle bag and a shoe with the name "Gonzales" on it, Gonzales denied that he had ever seen it before. Yet on the witness stand during the trial he readily admitted that it belonged to

him. One reviews this entire testimony and comes away with abiding conviction that the responsibility for the death of Nellie Wells rests with this defendant. He left Springfield and did not return for his duffle bag or stop off for it. After learning from his parents in Missouri that he was wanted on suspicion of murder, he kept on going. His conduct as related to the police officers, his statement basically that when he was angry, he was a Dr. Jekyll and Mr. Hyde, his statement that he was willing to plead guilty to a lesser crime because he was afraid of his life suggest that he well knew of the evidence the prosecution had against him. His volunteered statement in Louisiana that he was wanted in Springfield on suspicion of murder suggests a guilty conscience. We recognize from this record that there is no evidence that directly and unequivocally establishes the guilt of the defendant. The finger points directly to Gonzales as the one who was present at the scene, was possessed of a knife compatible with the type of wounds the body had, two witnesses who testified to an argument between the decedent and the defendant and circumstances from which a jury could reasonably believe the defendant's guilt beyond a reasonable doubt.

 Accordingly, we are of the opinion that the evidence in this record, though circumstantial, establishes the guilt of the defendant beyond a reasonable doubt, and that he did have a fair trial. Accordingly, the judgment of the trial court is affirmed.

Affirmed.

TRAPP, P. J. and CRAVEN, J., concur.