**People of the State of Illinois, Plaintiff-Appellee, v. Del Gullickson, Defendant-Appellant.**

**Gen. No. 52,622.**

First District, Fourth Division.
September 24, 1969.
Rehearing denied October 24, 1969.

Gerald W. Getty, Public Defender of Cook County, of Chicago (Harold A. Cowen, Norman W. Fishman, and James J. Doherty, Assistant Public Defenders, of counsel), for appellant.

Edward V. Hanrahan, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and Michael D. Stevenson, Assistant State's Attorneys, of counsel), for appellee.

MR. PRESIDING JUSTICE DRUCKER delivered the opinion of the court.

Defendant was tried before a jury and found guilty of murder. Judgment was entered and defendant was sentenced to the Illinois State Penitentiary for a term of not less than fourteen nor more than twenty years. Defendant raises two points on appeal: (1) he was not proven guilty beyond a reasonable doubt; and (2) he was prejudiced by the prosecutor's improper concluding argument.

EVIDENCE

Testimony of Norma Sargent, called by the State:

She resides with her husband, Edward, at 4929 Winthrop. On September 24, 1966, she was living with her husband at 4356 North Kenmore. She knew both defendant and the decedent.

On September 24, 1966, defendant was living with decedent upstairs of her. At about 9:30 that morning decedent came down to her apartment and left her keys for defendant because she was leaving him.

She saw decedent again at about 10:30 or 11:00 in the morning walking down Wilson and Broadway with her little girl, Denice. She helped decedent with her shopping bags. Nothing was said.

At about 3:30 that afternoon she saw defendant when he came to her apartment. Defendant was angry because decedent had left. He said that he was going to "blow her m——— -f——— head off." He also said that if he could not get decedent he was going to get the little girl.

She later saw decedent standing outside of Hillman's with Rita Braddock. Decedent asked her for a ride. Defendant then came down the street, got in the back seat of her car with decedent and asked decedent to go with him, but she did not answer. Defendant then left taking Denice with him. That was the last time she saw decedent alive.

About 11:30 that night defendant came to her apartment to speak to her husband. He asked for the gun, and it was given to him. Defendant said he had a sale for it. Her husband told him not to do anything foolish, and defendant said that he would not.

Testimony of Edward Sargent, called by the State:

On September 24, 1966, defendant came to his apartment at about 3:30 in the afternoon. He said that he was going to shoot decedent's head off. That is all he said.

At about 4:30 in the afternoon he saw decedent and defendant in the car with Rita Braddock. Defendant wanted to take decedent home, but she remained in the car. He left taking the little girl with him.

Defendant came to his apartment at about 11:30 that evening, asked for the gun and said that he had a sale for it. He gave defendant the unloaded gun and also gave him four bullets in a separate package. He told defendant not to do anything foolish.

Testimony of John Marron, called by the State:

He is an officer in the Chicago Police Department. On September 24, 1966, he was patrolling in a squad car with Officer Thomas O'Connell in the vicinity of Lawrence Avenue and Broadway.

At about 2:45 a. m. on September 25, 1966, he was in the 1100 block on Lawrence when he saw defendant and decedent pinned against one of the supports of the "el" structure. Defendant's back was toward him. He observed defendant punching at the woman with his right hand, and brought the car to a halt about twenty feet to the rear of the altercation and approached the people. He saw defendant's right arm coming back. He could not see defendant's hand, he could only see the back portion of his arm. Defendant had nothing in his left hand. The girl appeared to be crying; he could not see what she was doing with her hands.

He was an arm's length from defendant when he heard a shot fired. He then hit defendant with his nightstick, and defendant fell. He then saw the woman who had not yet fallen; she was doubled up. When the man fell, he could see a gun in his hand. He did not see the gun when the shot was fired.

Testimony of Jerome O'Donnell, called by the State:

He is an officer in the Chicago Police Department. On September 25, 1966, he was patrolling in a squad car with Officer Robert Buckley in the vicinity of 1100 on Lawrence Avenue. At approximately 2:45 a. m. he noticed a couple standing against a pillar under the Lawrence Avenue elevated. It appeared as though they were having an argument. The woman was up against the pillar. He saw the back part of the man's elbow moving backward and forward. He and his partner got out of their car and approached the couple. He saw Officer Marron standing by the couple; he had subdued the man who was falling. The gun was pointing upward, and the man started to cock it as he fell. He did not at any time see the

gun in the woman's hands. He does not remember what the woman's right hand was doing, and he could not see her left hand at all. He could not see the man's right hand; his left hand was about her waist. When he got out of the car, defendant was looking toward him.

Testimony of Robert Buckley, called by the State:

He is an officer on the Chicago Police Department. On September 25, 1966, he was patrolling in a squad car with Officer O'Donnell in the vicinity of Lawrence and Broadway.

As he was travelling west on the 1100 block of Lawrence he noticed a woman leaning against a pillar with a man, the defendant, who appeared to be kissing her. As he got closer she turned towards him and he could see tears in her eyes. At that time defendant also turned towards him and saw him. Defendant reached with his right hand and moved his coat back. He said to his partner, "He may have a gun. Let's pull over." They were about ten feet away at that time. They pulled over between ten and fifteen feet past the pillar. As he approached he could see neither defendant nor decedent. He heard a shot and saw the defendant fall. In his right hand defendant had a cocked revolver. As defendant fell Officer O'Donnell kicked the gun from defendant's hand.

He did not see the gun in the woman's hand; but he could not see her complete body because defendant was leaning right up against her. Defendant was pulling his coat back to his right side.

He thinks defendant's left hand was around the woman's waist, but he is not sure. He could not see defendant's right hand. He could see defendant's right elbow and he saw the coat move. In his opinion, defendant was reaching for something.

Testimony of Gerald Norris, called by the defense:

On September 24, 1966, he lived in Chicago at 1427 West Balmoral. On that date defendant brought his little

girl to his house to keep. Defendant stayed there with the girl until about 10:15, they had both fallen asleep. Defendant had a reputation for being peaceful and law-abiding. Defendant said that he would pick up his little girl the next day.

Testimony of Del R. Gullickson, defendant:

On September 24, 1966, he was living with his "common-law wife," Mary Lou Jackson, the decedent, and his two-year-old daughter, Denice. He had lived with decedent previously in Minneapolis. He knows Norma and Ed Sargent. Norma spent a good deal of time with decedent; they would drink together. One time when decedent left him, Norma would not tell him where she had gone.

He returned from work at about 3:30 p. m. on September 24, 1966, to find his door locked. He then went looking for decedent and his daughter. He returned to the apartment building just as the Sargents drove up. Norma said that she did not know where decedent was but that she had his house keys which she gave to him.

He then went driving around some more looking for decedent and his daughter. As he proceeded up Broadway he saw decedent getting into the Sargents' car. He double parked alongside of them, got out of his car and asked decedent to come home with him and take care of their daughter. Decedent did not respond. He then said, "Well, I'm taking my daughter with me. The way you people carry on up there and drink and have parties, she's going to end up being killed." He said that he was going to take his daughter back to Minnesota.

He then went to Gerald Norris' house to leave his daughter. He was going to go back to his house to get his clothes, but his daughter did not want him to leave, so he gave her some milk and lay down with her. He and his daughter fell asleep, and he awoke at 10:00 or 10:30.

162

He intended to go back to Minnesota but he did not have too much money and the car needed a tire. He had a beer and then proceeded to his apartment where he packed his belongings and put them in the car. He then went to the Sargents' apartment to get his gun with the intent of selling it. He took the gun and put it in the glove compartment of the car. He then drove to places where he thought he might find decedent. He intended to try to persuade her to go to Minnesota with him.

He found decedent at the Clifton Tap, a tavern right off Lawrence Avenue near Broadway. He went in and went up to her, and she started to scream and holler. He asked why she left; and she replied it was because he had taken her sister out one time. He then asked her to come to Minnesota and help him care for their daughter.

Decedent left the tavern with him and they walked to his car. They argued about his having taken her sister out; he denied it, claiming that Norma Sargent had made it up. Her hair was a mess and she started to fix it. She took some bobby pins out and set them on the glove compartment door. She saw the gun in the glove compartment.

He asked her if she wanted to go, and she suggested that they get some more beer. He did not want to, but when she got angry again, he agreed. They got out of the car and she began walking ahead of him towards Lawrence Avenue. He caught up with her under the "el" tracks. As he approached he said, "Wait up." He heard her swear. As he got closer he heard her say, "You son of a bitch. I put you in the hospital once before. This time I am going to kill you." She wheeled around to face him, and he saw that she had his gun in her hand. He grabbed her by the wrist and pushed her against the "el" pillar. He then reached down and tried to twist the gun out of her hand. She was hanging onto

163

the gun, he was off balance; he pulled back on it as she was also pulling and it went off.

As he was struggling he saw the police cars arrive and he saw one officer get out of the driver's side. He got scared from the shot, and felt very weak. He fainted; he believes that he was struck in the back of the neck.

At no time did he say that he was going to kill decedent or blow her head off. Decedent once cut him on the face so badly that he required hospital treatment.

OPINION

■ Defendant contends that he was not proven guilty beyond a reasonable doubt. He first urges that the prosecution did not establish a motive for the killing. Where a deliberate criminal act is established, there is no necessity for proving motive. People v. Irvin, 104 Ill App2d 316, 325, 244 NE2d 351; People v. Hobbs, 35 Ill2d 263, 220 NE2d 469. Since the jury could find from the evidence that defendant deliberately committed the murder, proof of motive is immaterial. Nevertheless, we point out that there was evidence of threats by defendant against decedent.

■ Defendant also contends that lack of sufficient proof of his guilt stems from the absence of testimony that he was holding the gun when the shot was fired. According to defendant's account, decedent held the gun on him and it went off during a struggle over it. He testified that he grabbed the gun and attempted to twist it out of decedent's grasp; he said that when they pulled in opposite directions, the gun went off. At no time did he testify that he successfully wrested the gun from decedent's control. The jury could find that defendant must have had control of the gun at some time before the discharge because the police saw the gun in defendant's hand and he had cocked it instantaneously after the shot. Further the police testified that defendant was facing decedent and was moving his right arm back and forth.

This belies defendant's testimony that he was holding decedent's right hand, allegedly her gun hand, in his right hand.

█ Defendant next urges that the testimony of Norma and Edward Sargent that defendant threatened to kill her must be disbelieved. This contention is based on the fact that Norma testified that defendant threatened to kill both his wife and their daughter, whereas Edward only recalled defendant's threat to kill his wife. However, both witnesses testified that defendant did threaten to blow his wife's head off; and this is the relevant and crucial testimony. The discrepancy concerning a threat towards defendant's daughter is of minor importance.

█ Defendant argues that decedent had been drinking heavily; that when intoxicated she was belligerent as evidenced by a prior cutting of defendant's face; that therefore his account of the shooting is credible and raises a reasonable doubt of his guilt. It was for the jurors to accept the testimony they believed and reject that which they disbelieved. People v. Wilson, 1 Ill2d 178, 188, 155 NE2d 250. We will not substitute our judgment for that of the jury in merely weighing the credibility of witnesses where the testimony is conflicting. People v. Woodruff, 9 Ill2d 429, 434, 137 NE2d 809.

█ Nor can we agree with defendant's contention that the evidence supports a hypothesis of innocence and that it was therefore the duty of the jury to accept defendant's explanation of the shooting. His defense of accidental shooting must stand or fall on the weight and credibility of his own testimony. People v. Neal, 98 Ill App2d 454, 240 NE2d 784. The jury was warranted in finding that defendant did not present a reasonable or credible defense.

█ Defendant claims that the prosecutor misrepresented evidence to the jury thereby depriving defendant of a fair trial. In summation the prosecutor implied that

165

defendant maneuvered the decedent under the viaduct and that the path there was not the direct route to the liquor store. Defendant argues that this conclusion is not supported by the evidence and therefore was improper. Defendant also argues that the prosecutor used inflammatory language in summation. We note however, that no objections to these statements were made at trial and these issues are waived. People v. Cionte, 102 Ill App2d 1, 11, 243 NE2d 407; People v. Conrad, 81 Ill App2d 34, 225 NE2d 713.

■ Defendant also contends that he was prejudiced by the prosecutor's statement, "In my opinion, Del Gullickson deliberately and with premeditation took the life of Mary Lou Jackson." It is well established that it is proper for a prosecutor to argue or express his opinion of the guilt of the accused where it is apparent that such opinion is based on the evidence. People v. Jackson, 35 Ill2d 162, 171, 220 NE2d 229. We are convinced that the prosecutor's statement was intended and was understood by the jury to be his opinion based upon the evidence since he prefaced it with the following:

> . . . [W]hat I am going to say and what my remarks will include and what Mr. Wolfson (defense attorney) had previously said . . . is not to be construed as evidence. As you well know or as you have been told, what we say are our opinions, the way we look at the facts as they were presented to you. But I suggest that the State's remarks are a logical and reasonable interpretation of the facts as told to you.

In this statement the prosecutor clearly indicated that the whole of his remarks were based on the evidence. We therefore find that there was nothing improper in the prosecutor's challenged statement.

Reviewing the entire record of proceedings we hold that the defendant received a fair trial and was proven guilty of murder beyond a reasonable doubt. The judgment of the trial court is therefore affirmed.

Affirmed.

ENGLISH and McNAMARA, JJ., concur.