THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* WILLIAM OLIVER, Defendant-Appellant.

(No. 71-207;

Third District—May 9, 1973.

John L. Barton, of Marseilles, for appellant.

F. Stewart Merdian, Assistant State's Attorney, of Rock Island, for the People.

Mr. PRESIDING JUSTICE ALLOY delivered the opinion of the court:

This is an appeal from the judgment of the circuit court of Rock Island County entered following a verdict of guilt of Aggravated Battery as to defendant William Oliver, pursuant to which he was sentenced to a term of not less than 1 nor more than 3 years.

The indictment against defendant William Oliver charged him in three counts with the commission of the crimes of Attempted Murder, Aggravated Battery with a Deadly Weapon, and Aggravated Battery Causing Great Bodily Harm. One count was dismissed and defendant was tried before a jury on the counts charging Attempted Murder and Aggravated Battery Causing Great Bodily Harm. The jury found him not guilty of the charge of Attempted Murder but did find him guilty of the Aggravated Battery charge. On appeal in this court, defendant contends that there was insufficient evidence to find him guilty beyond a reasonable doubt and that he was acting in self-defense. He also complains that certain allegedly improper and prejudicial statements arising from the closing argument of the Assistant State's Attorney, certain

hearsay evidence and the admission of a certain incriminating statement by defendant, operated to deprive defendant of his right to a fair trial.

From the record, it is noted that on the evening of March 21, 1971, defendant William Oliver entered Betty & Burlin's Tavern in Rock Island with a companion, R. D. Robinson. In addition to the owners, Betty and Burlin Morrison, a number of people were in the tavern, including two off-duty police officers in civilian clothes, James Hartman and James Barton. Hartman's wife, Linda, and Barton's girlfriend, Lois Sabol, a Gene Swanson and his wife, Martha, Donald DeFrieze, Sr., and his son, Don Jr., Ralph Woeckner, an auxiliary policeman, and his wife, and four deaf mutes, including one named Clay Mick, were in the tavern.

Betty was working behind the bar with her husband Burlin. She noticed that defendant arrived with Robinson at approximately 9:30 P.M. She recognized both men as former patrons. She said that while they did not appear to be intoxicated, it was evident that they had been drinking. Both Robinson and defendant had met approximately 10½ hours earlier in another tavern and had spent the rest of the day drinking beer in two taverns before they arrived at Betty & Burlin's.

They sat at the north end of the bar near the jukebox and ordered some peanuts but nothing to drink according to the owner. Defendant and Robinson claimed they ordered and received two beers. The incident under consideration began when defendant left his seat and walked to a bowling machine being used by the deaf mutes. When he saw that the machine was in use, defendant approached Barton who was seated at the bar talking to his girlfriend and tapped him on the shoulder. Defendant asked Barton if he knew who was using the bowling machine. Barton replied that he did not know. Defendant walked away but returned a few minutes later and asked the same question again, and again the defendant was given the same reply. Defendant left for a few minutes but returned for a third time and again asked the same question. This time Barton told him to go back and sit down and leave him alone.

Robinson, who did not hear the conversation, thought that defendant had challenged someone at the pool table to a game to which some "guy" who was way in the back said he would not play pool with a "nigger", to which defendant replied, "kiss my ass." Defendant specifically denied the incident. Defendant said that Barton had told him that he was not using the machine and that defendant should go ahead and use it. When he walked back to Robinson, defendant stated, "Well, somebody in here should know who is using the bowling machine."

At this, Betty, who knew the deaf mutes were using the machine but had not intervened because she knew the defendant also knew who was

using it, told defendant to go sit down and be quiet. Defendant said he returned to his seat but did not sit down and proceeded to complain to his companion Robinson. The remarks of defendant did not consist merely of complaints but vulgar and abusive language to Barton which many of the patrons heard. Betty told defendant that if he did not stop using profanity he would be required to leave. Defendant indicated he would not say any more but started in again. After Betty asked defendant 4 or 5 times to stop such language, her husband Burlin walked over to Robinson and asked him to take the defendant outside. Robinson said he got up and told defendant twice to "forget it * * * come on, let's go * * * let's get out of here" and even placed his arm around defendant's shoulder to "calm him down." Defendant said he didn't hear Robinson tell him this. Defendant said he wasn't leaving until he was "good and ready." Betty then asked Hartman and Barton if they would help her because she knew they were police officers. Both Hartman and Barton proceeded to the end of the bar. Hartman arrived first and Barton then approached from the wet side of the bar. They both testified that Hartman asked defendant to leave and that defendant replied with more profanity. Defendant asked Hartman to identify himself, to which Hartman replied that they were police officers. Defendant indicated that the "guy" who was playing pool (Hartman) came around the other side of the pool table and said "something" (he couldn't imagine what) to Robinson to which Robinson replied, "So what?".

Hartman and Barton testified that when Barton started to reach for his identification, defendant took a swing at him. Although no one but Hartman and Barton heard Barton or Hartman identify themselves as police officers, several witnesses for the People testified that defendant took the first swing. Barton blocked the punch and defendant fell to the floor. Barton was then grabbed by Robinson and then Hartman sought to aid Barton and grabbed defendant and pushed him back against the wall, in an attempt to break up the scuffle. Robinson and defendant contended that the scuffle began when Robinson got hit with a pool stick from an unknown source. Defendant claimed, however, that Hartman hit Robinson in the face. He didn't see what was used if anything because it happened so fast. Robinson claimed that his hand was being held to his back while he was being choked, kicked or beaten. Defendant indicated that while Robinson was being beaten he turned around while still standing at the bar to see who was beating Robinson and was hit by a white man with a pool cue. The other people at the tavern testified that at no time did they see either man being hit with a pool cue. Clay Mick, the deaf mute, who knew both Robinson and the defendant said that he did not see anyone hit the defendant with a pool cue at such time.

Defendant claimed he was able to reach into his pocket, take out his knife, and pull it open with one hand while three men were on top of him. He said that he did not deliberately stab at anyone and that Hartman must have fallen against the knife. This was controverted by three eye-witnesses who observed the actual stabbing of Hartman by defendant. Even Clay Mick, the deaf mute witness for defendant, admitted he saw defendant stab Hartman. The knife was finally removed from defendant's hand by force.

Evidence of witnesses following the incident and when Robinson and the defendant were subdued, indicated that Hartman's shirt was soaked with blood and the actual wounds were seen at both the tavern and the hospital and that defendant and his companion also exhibited evidence of injuries. When defendant and Robinson arrived at the hospital, they were taken to emergency rooms where Robinson refused treatment. Defendant continued to curse and threaten his captors but when informed that the person stabbed had been a policeman, all he could say was "I'm sorry, I'm sorry." Defendant was hospitalized 3 days as a result of his injuries and Officer Hartman was hospitalized for 8 days.

■■ It was clear from the record that the jury was justified in not believing defendant's affirmative defense of justifiable use of force or self-defense. Persons seeking to avail themselves of the affirmative defense of justifiable use of force must not be the aggressors. (Ill. Rev. Stat. 1971, ch. 38, sec. 7—1, Committee Comments.) It was clear from the evidence that several witnesses saw defendant initiate the confrontation both verbally and physically. Defendant's injuries were received not as a result of being attacked but in the process of a fight which he himself had initiated. Some of defendant's injuries were obviously the result of having been pushed onto a plywood board which had nails protruding from it behind the bowling machine. On the basis of the evidence, it is clear that the jury as the trier of the facts, believed the many witnesses for the State who testified as to defendant's belligerent behavior and also that the witnesses clearly observed him stab Hartman. The verdict rendered by the jury under such conditions would not be disturbed unless it is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of defendant's guilt. (*People v. Norris*, 118 Ill.App.2d 406, 254 N.E.2d 304.) The jury heard and saw the witnesses and were in best position to judge credibility of witnesses and observe the demeanor of the witnesses. The evidence presented was credible and substantial and was sufficient to sustain the verdict. There is no basis, therefore, in finding that the verdict of the jury was not supported by evidence which would justify the finding of guilt as returned by the jury.

As to the supplementary issues which were raised by defendant, such points are not properly before this court on review due to the fact that no objection was raised either at the time of trial or in defendant's post trial motion. We have frequently said that the making of a proper objection at the time of trial is essential in order to preserve for review any contention that errors in admission of evidence occurred. Similarly, such objections should be set forth in the motion for new trial and a failure to do so amounts to a waiver by defendant. (*People v. Irwin*, 32 Ill.2d 441, 244 N.E.2d 351.) We do not believe it is of value to go into detail as to the nature of objections made other than to observe that the remarks objected to simply corroborated eyewitness testimony by four witnesses to the actual stabbing and even if an objection had been made the admission of the remarks in evidence would have been harmless.

The final point which was made by defendant related to his statement made at the hospital. This did not involve his so-called *"Miranda"* rights since defendant simply volunteered the statement and the statements were not the result of interrogation of defendant. (*People v. Routt*, 100 Ill.App.2d 388, 241 N.E.2d 206.) There is nothing in the *Miranda* precedent which requires that a police officer close his ears to the statements which are made by an accused unless the statements are the product of an in-custody interrogation without the so-called *Miranda* warning. (*People v. Gonzales*, 107 Ill.App.2d 44, 245 N.E.2d 791.) It is, therefore, apparent that there is no reversible error in the record and that the judgment of the circuit court of Rock Island County was proper and should be affirmed. Such judgment is, therefore, affirmed.

Affirmed.

STOUDER and DIXON, JJ., concur.