**People of the State of Illinois, Plaintiff-Appellee, v. Ronald Larry Lowe, Defendant-Appellant.**

**Gen. No. 11,135.**

Fourth District.

April 29, 1970.

Rehearing denied June 1, 1970.

198

Robert D. Owen, of Decatur, for appellant.

Basil G. Greanias, State's Attorney of Macon County, of Decatur, for appellee.

TRAPP, J.

Defendant was convicted of murder upon the verdict of a jury and sentenced to a term of from 40 to 60 years. He appeals.

Issues presented upon appeal include the sufficiency of Count II of the indictment; the alleged error in admitting into evidence a statement of the defendant to police at the scene without Miranda warnings being given; the alleged error in instructing the jury as to the offense of murder and in refusing certain defendant's instructions, and whether prejudice to a fair trial resulted from the State's argument to the jury, and certain events occurring during the trial which will be discussed more fully hereinafter.

Defendant was the husband of the victim. At about 9:00 a. m. on March 10, 1968, the deceased wife was found seated in a chair dead from a shotgun wound in the chest. The shotgun was lying on the floor some few feet from the body. The defendant was discovered seated in the basement with his clothing saturated with blood, and his arms and legs slashed. He appeared to be quite weak, and was shortly thereafter taken to a hospital where he was treated for shock and given a blood transfusion.

The room in which the body of the wife was found was in great disarray with blood scattered about, razor blades were scattered about and pictures of the wife were cut or torn. The chandelier was pulled from the ceiling and a piece of wire was hanging from it, which was said to suggest that there was an attempt at suicide by hanging. Blood was found in the kitchen and in the bathroom. A three-month-old baby of the victim was found in a crib or cot nearby.

The shotgun was owned by the defendant and he testified that it was kept in a gun case in a box in the closet. Investigating officers testified to finding the gun case lying in or across a box resting on a chair in the closet. Defendant testified that his wife was never known to handle or touch the gun.

Neighbors who resided immediately above the quarters of defendant testified that they heard a violent and prolonged quarrel commencing about 1:30 a. m. on March 10th, and continuing until at least 2:00 a. m., when they went to sleep.

The essential factors to be considered primarily arise from the testimony of the defendant. They are that his wife returned home at about 1:30 a. m., having been gone since 1:00 p. m. the previous afternoon. Defendant testifies that he had been drinking. He testified that she came in, changed to her nightgown and came out with the baby. By processes not very clearly brought out,

201

they became involved in a violent quarrel. It is corroborated that the wife seemed to take some pleasure in applying humiliating nicknames to her husband. According to his testimony, she further humiliated him in discussing the paternity of the three-month-old baby. It appears that the victim had an older child of some five or six years whose father was a man named Worley; that she had Worley's initials and a heart in tatoo on her thumb; and that she, with defendant's apparent knowledge, spent some six weeks in the west with Worley and returned about eight months before the baby was born.

Defendant testified that he recalls a prolonged quarrel, but that his recollection of what actually transpired fails. He testified that he next recalls discovering himself, at about 4:00 a. m., seated in a chair with the shotgun on the floor and his wife seated in a chair apparently dead; that he walked four blocks to his sister's to get help but could rouse no one, and then returned and slashed his wrists with a razor. Thereafter, he went to the basement and remained until discovered at about 9:00 a. m. in the morning.

Defendant challenges the sufficiency of Count II of the indictment as a charge of murder. The language of the Count is:

> ". . . committed the offense of murder in violation of Chapter 38, § 9–1, Ill Rev Stats, 1967, in that he killed Deanna Lowe without lawful justification by shooting her with a gun, knowing that such action created a strong probability of death or great bodily harm to Deanna Lowe. . . ."

It is recognized by counsel that such is a charge in the language of chapter 38, § 9–1(a)(2), Ill Rev Stats 1967. It is argued however that the conduct proscribed is so uncertain that the section is unconstitutional and that an indictment through such section:

". . . does not allege all the substantial elements of murder because the intention to do the act that results in death is a necessary element which is incorporated in other sections of the Code and which must be alleged in the indictment."

██ In The People v. Davis, 35 Ill2d 55, 219 NE2d 468, the court considered an instruction stated in the language of § 9–1(a) (2) and in substantially the identical language of this indictment. There the argument was made that the jury:

". . . should have been instructed that they must find that the defendant had the *intention to engage* in conduct the result of which. . . ." (Emphasis supplied.),

and that the instruction and statute was violative of due process. The court said:

"In our opinion, neither the statute nor the instructions violated the constitutional rights of the defendant,"

and further noted that intent may be implied from the character of the act. It may be pointed out that the comment of the Drafting Committee of the Code concerning the section at issue said that the word "knows" as used in § 9–1(a) (2) is defined in chapter 38, § 4–5(b) as,

". . . consciously aware that such result is practically certain to be caused by his conduct."

The act of shooting while consciously aware of the probable result, we believe, sufficiently charges an intent to do the act for purposes of defendant's argument.

It is contended that the court erred in admitting into evidence the testimony of a police officer, Derr, as to the statement of defendant made at the scene:

"I killed her and the gun is on the living room floor."

No Miranda warning had been given at such time. The argument here is directed to the issue as to whether the defendant was in custody.

A motion to suppress was made and evidence heard. Defendant did not testify upon such motion, but several officers did describe discovering the defendant in his bloody and apparently weakened condition. It is noted that within 15 or 20 minutes defendant was taken to the hospital where he was treated for shock and given blood. Several police officers testified as to asking defendant concerning his injuries and whether he needed medical or hospital care. Derr came upon the scene somewhat later. He appears to have been in a position of supervision of the case. He testified that he asked concerning defendant's condition and need for care, and that in replying to such inquiry about the need for medical or hospital care, defendant volunteered the statement to which objection is now made. The officers present at this particular time testified that they heard Derr's questions but did not hear the answers or the statement by the defendant now in evidence. They say that there were no questions concerning the shooting.

Both at the time of ruling upon the motion and at the time the testimony was admitted over objection during the trial, there was no evidence other than that defendant spoke spontaneously, and that there were no questions asked him concerning incriminating facts as in Orozco v. Texas, 394 US 324, 22 L Ed2d 311. It is only when defendant testified in his own behalf at the trial that it is claimed that he was asked if the gun on the floor was the one he used. At this point we find neither renewal of the motion to exclude Derr's testimony, nor any other pertinent motion upon the issue.

Where there is no apparent custodial interrogation, a police officer is not required to interrupt a spontaneous statement made by the defendant. In re Orr, 38 Ill2d 417, 231 NE2d 424; People v. Routt, 100 Ill App2d 388, 241 NE2d 206; People v. Gonzales, 107 Ill App2d 44, 245 NE2d 791. In Miranda, 384 US 436, 16 L Ed2d 694, it is expressly stated that the rule of exclusion of defendant's statement does not apply to voluntary statements made without questioning initiated by law enforcement officials.

Defendant next argues that the evidence is not sufficient to sustain a verdict of murder, it being his theory that the evidence does not "exclude" the conclusion that the death was involuntary manslaughter in that the gun was handled recklessly, or that there was an accidental shooting during a struggle over the weapon. It is urged that the shooting must have occurred while the parties were struggling with the gun by reason of inferences argued from the following circumstances: (1) the weapon was fired from a distance of two feet or less, (2) that the decedent was seated in a light chair and that the force of the shotgun blast would have caused the body and chair to be knocked over when fired at such close range, and (3) that the fingerprint expert found only smudges of fingerprints on the weapon, although he was of the opinion that the gun had not been "wiped" to clean it. From such data defendant urges that it is not reasonable to believe that one would shoot to kill with a muzzle within less than two feet, but that one would stand back, and that the fact must have been that the parties were standing and wrestling with the gun and that the decedent was shot and staggered back two steps to collapse into the chair.

The hypothesis that the smudged fingerprints are evidence of a struggle does not seem to explain the testi-

mony of defendant that when he returned to a period of which he has recollection, he picked up the shotgun, extracted the expended shell and laid the gun on the floor. The jury might consider that it appears that such prints were also apparently smudged.

The deceased is described as being 5 feet, 8 inches tall, and weighing 145 pounds. It is a matter for the determination of the jury whether such a person staggering or collapsing backward into the described chair would be more likely to overturn the chair than a shotgun blast received by a seated person whose substantial weight gave some stability to the chair and whose body resilience absorbed some of the blast effect. From the testimony the shot entered the body almost in a straight line or a direct plane. Such fact does not necessarily persuade of a violent struggle over the gun.

The defendant's testimony directs us to a quarrel during which he became more angry than he had ever been. This is supported by the evidence of the slashed or torn photograph of his wife and the possible attempt to hang himself, and the clear-cut evidence that his wrists were slashed in a substantial attempt to commit suicide.

While the defendant's statement that he shot his wife, as it appears in the record, is not necessarily conclusive of murder, it is a link in the chain of circumstantial evidence, which considered with all of the other evidence, supports the conclusion of guilt beyond a reasonable doubt. People v. Martin, 77 Ill App2d 183, 222 NE2d 180.

The defendant contends that the court erred in giving People's Instruction No. 12, which defines murder in the language of chapter 38, § 9–1(a)(1) and (2). As noted in discussion of the argument upon the sufficiency of Count II, this instruction is in the form and in substantially identical language as the instruction approved in The People v. Davis, 35 Ill2d 55, 219 NE2d 468.

It is urged that the court erred in giving People's Instruction No. 11 in the language:

"Motive is that which prompts a person to act. The State is not required to prove a motive for the commission of the crime charged."

This is the language of IPI, Criminal, § 3.04, although such was not in effect at the time of the trial. Defendant argues the rule of The People v. Enright, 256 Ill 221, 99 NE 936, which holds that such instruction should not be given where the prosecution introduces evidence of motive and argues it to the jury. Defendant points out that the prosecution questioned the sister of the victim concerning threats to kill his wife made by defendant some two years prior. We do not understand from the record that such evidence was designed to show motive for this shooting.

The defendant argued strongly as to provocation and passion resulting from the humiliating remarks of the wife which were testified to by the defendant. The evidence is that the wife had made the same or similar remarks upon other occasions. The great anger to which defendant testifies seems to come within the definition of motive. Motive is not necessarily only a desire for gain as appears to be argued by the defendant. The remarks made by the prosecution in closing argument were comments directed to defendant's argument to the jury upon provocation rather than to assert that the State had proven motive. The giving of the instruction did not violate the rule of Enright.

It is urged that the court erred in giving People's Instruction No. 14. It is in the language:

"A person kills another 'without lawful justification' unless he reasonably believes that the use of the force which resulted in the death of the other

was necessary to prevent imminent death or great bodily harm to himself."

It is urged that there was no evidence to support the giving of the instruction, and that it relates only to self-defense, thereby misleading the jury when applied to the statutory definition of voluntary manslaughter. It is noted, however, that defendant's given Instruction No. 1 defining voluntary manslaughter included the words "without lawful justification." The language of the instruction is a reasonable paraphrase of the second sentence found in chapter 38, § 7–1, Ill Rev Stats 1967. It also appears that such words placed in the instructions defining the three forms of offense might create uncertainty in the minds of the jury as to what they must determine. It is not apparent that such instruction misleads or confuses, and there is no such prejudice to defendant as to require reversal. The People v. Rongetti, 344 Ill 107, 176 NE 292.

 The defendant argues error in the denial of defendant's Instruction No. 4 which limits the definition of murder to instances where defendant "intends to kill or do great bodily harm," and it is further argued that this instruction should have been given rather than People's Instruction No. 12. Upon the authority of The People v. Davis, 35 Ill2d 55, 219 NE2d 468, this instruction was properly refused.

 The trial court refused to give defendant's Instruction No. 6 which undertook to explain that the presence or absence of malice was the distinction between murder and manslaughter, and continued to state the distinguishing definitions of express and implied malice. It is urged that such denial was error. The trial court gave defendant's Instruction No. 1 which defined voluntary manslaughter in the language of chapter 38, § 9–2, Ill Rev Stats 1967. In The People v. Davis, the Supreme Court stated its approval of the definitions of homicide

which avoided the common law language of "malice aforethought" and the difficulty of expressing to a lay jury the distinctions of malice, express and implied. Upon such authority the denial of the instruction was not error.

The trial court refused to give defendant's Instruction No. 2 concerning the offense of involuntary manslaughter. This is said to be error. At the instruction conference the trial court noted that the defendant's evidence was directed to show provocation of the defendant. In argument to the jury defendant's counsel argued provocation and also that the evidence supported a conclusion of accidental death during a violent struggle with the shotgun.

■ It is held that an instruction of involuntary manslaughter should be refused where the theory is that death was by accident or misadventure as the two are inconsistent and cannot be reconciled. The People v. Tanthorey, 404 Ill 520, 89 NE2d 403; People v. Dockery, 72 Ill App2d 345, 219 NE2d 687; People v. Johnson, 54 Ill App2d 27, 203 NE2d 283.

■ The court denied defendant's Instruction No. 5 which advised the jury that if they could reconcile the evidence upon any reasonable theory other than that of defendant's guilt there was a duty to do so and to acquit. The court gave an instruction upon the presumption of innocence and the prosecution's burden of proving guilt beyond a reasonable doubt. The court also gave defendant's Instruction No. 3 that defendant was entitled to the benefit of the doubt as to whether the killing was murder or manslaughter,

". . . or if there is a reasonable doubt as to either murder or manslaughter be acquitted."

As stated in The People v. Russell, 17 Ill2d 328, 161 NE2d 309;

"The jury was not required to search out a series of potential explanations compatible with innocence,

209

and elevate them to the status of a reasonable doubt."

The correct standard by which the jury measures guilt is that of reasonable doubt. In The People v. Malmenato, 14 Ill2d 52, 150 NE2d 806, the court said:

"Reasonable doubt is a term which needs no elaboration and we have so frequently discussed the futility of attempting to define it that we might expect the practice to be discontinued."

See IPI, Criminal, § 2.05. It is noted that the defendant did not tender an instruction upon the possible issue of misadventure.

It is urged that the court erred in denying a motion for mistrial by reason of the publication of a news article occurring during the trial. The parties had stipulated that the jury might be permitted to separate each night until the case was submitted to the jury. The news story related to certain testimony taken out of the presence of the jury. It is agreed that the news story was accurate in content, but that the headline was misleading and inaccurate. It reads, "Admits Murder" rather than "Admits Shooting."

The record shows that the trial court had very sternly admonished the jury upon the necessity of refraining from reading about the trial while they were serving, and requested them to have members of their respective families monitor the news and remove any accounts relating to the trial. Such admonitions were regularly repeated throughout the trial.

 Upon a discussion of the motion for mistrial, it was agreed that if any juror answered that he had seen the headline, the members of the jury should be interrogated separately. Defendant's counsel noted that it appeared to be a conscientious jury and requested the court to make it clear that a juror who had seen the head-

line would not be punished as a candid answer was desired. When the jury was returned into court, the responses were that no one had seen the headline and the trial was resumed. It is now argued that the jurors, or some of them, would be reluctant to admit a violation of the court's instructions and that defendant was denied a fair trial. Acceptance of this argument would produce the effect that the mere fact of publication of news concerning a trial would necessitate a mistrial, and there would be some considerable possibility that no criminal case which received publicity would ever be completed. Defendant made no further request for interrogation of the jurors, or inquiry made of them separately. We do not accept the proposition that the trial court may not believe the jurors who respond to the court's inquiries.

▮ Defendant complains that counsel were not advised of certain arrangements made by the court between the time the jury retired to consider its verdict at 12:55 p. m. and returned its verdict at 9:55 a. m. The record is blank as to what transpired. There is only a suggestion of some threatened disturbance outside of or around the courthouse, and that the court arranged for the jury to complete its deliberations at a hotel following the evening meal. We would be required to indulge the ultimate in speculation to conclude from this record that the jury did not fairly consider its verdict.

▮ Counsel also speaks of rumor in the community immediately prior to the commencement of the trial and a public feeling in favor of law and order, suggesting that he possibly erred in not asking for a continuance. Nothing in the record suggests prejudice which the customary voir dire would not disclose.

▮ Finally, defendant argues prejudicial error arising from the prosecution's argument. In opening, the State's Attorney discussed defendant's testimony that the officers had asked him questions which elicited the statement, "I shot her . . . ." It was then said, "He has

211

evidently heard of Miranda." No objection was made by defendant, no motion to strike was made, and the court had no request to admonish the jury. There is nothing in such statement which supports defendant's argument that the State's Attorney's statement must be considered as a disparagement of the decision of the United States Supreme Court.

In arguments before the jury, all counsel referred to provocation as it concerned the offense of manslaughter. Once the State's Attorney argued that the testimony showed a long continued quarrel and that such did not demonstrate a sudden and intense passion as is described in the Code. No objection or motion was made. Subsequently the prosecution argued that words alone do not amount to provocation within the definition of manslaughter. The court sustained defendant's objection and no more was said. There was no request to strike or admonish the jury.

Defendant argues that such statement was an incorrect statement of the law, and cites People v. Stepheny, 76 Ill App2d 131, 221 NE2d 798 and People v. Gajda, 87 Ill App2d 316, 232 NE2d 49, as holding that prolonged violent argument may constitute such provocation as to make homicide a voluntary manslaughter. In Stepheny the record shows testimony by the defendant that he fired when the deceased pulled a gun. In Gajda the defendant testified that the decedent had attacked him with a beer bottle. Thus, in each case there was more than a prolonged quarrel.

 It is correct that the Illinois Courts have said that quarrelsome words alone do not constitute such provocation as makes homicide voluntary manslaughter. While not frequently expressed in the opinions, the former Illinois statute upon voluntary manslaughter provided that there must be:

". . . a serious and highly provoking injury . . . or an attempt by the person killed to commit a serious personal injury. . . ."

Chapter 38, § 362, Ill Rev Stats 1959. Earlier statutes speak of an actual assault or an attempt to commit serious personal injury. The Committee Comments to the present Code, chapter 38, § 9–2, state the intent to define manslaughter as the common law offense in a form compatible with the reported Illinois cases. It is further stated that in such statutory definition the word "conduct" is used in lieu of the former words "highly provoking injury" and "attempt." Thus, the present Code contains neither an intent nor an effect which alters the statement of the rule concerning provocation and the prosecution did not incorrectly state the law. From the present statute and the explanatory comments there appears to be no legislative intent to extend provocation to quarrelsome words alone.

Finding no substantial error in the record, the judgment is affirmed.

Affirmed.

CRAVEN, P. J. and SMITH, J., concur.