THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v*. CARLOS FRANK COLON, Defendant-Appellant.

Second District   No. 77-336

Opinion filed March 20, 1979.

Robert P. Will, Jr., of Waukegan, for appellant.

Dennis P. Ryan, State's Attorney, of Waukegan (Phyllis J. Perko and Jan Tuckerman, of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE WOODWARD delivered the opinion of the court:

Carlos Frank Colon (defendant), along with Benel Lopez and Jose Ramos were charged in a six-count indictment with the murder of Michael Rivera; Melvin Lopez, Benel's brother, was also charged with Rivera's murder under a separate indictment. The charges against Ramos were dropped in exchange for testifying for the State against his former co-defendants. Following a jury trial in which defendant was represented by one attorney and the Lopez brothers by another attorney, Benel was found not guilty; defendant and Melvin Lopez were each found guilty of murder and each was sentenced to 25 to 60 years imprisonment. Defendant is the sole party to this appeal.

On August 14, 1975, the body of Michael Rivera was discovered lying in a ditch near the Amco Tool Company in North Chicago, Illinois; a bicycle was found nearby. Death resulted from multiple stab wounds in the chest.

On November 10, 1975, Francisco Reyes, defendant's minister, was summoned to St. Therese Hospital in Waukegan by defendant's parents. Reverend Reyes spoke with defendant who was in the emergency ward of the hospital; defendant appeared extremely agitated. Defendant told Reverend Reyes that he had taken part in a crime; Reverend Reyes advised him that he should tell the police about it in order to free his conscience. Defendant, after giving the matter some thought, agreed and the police were called.

Pursuant to a radio dispatch, Officer Larry Russell of the Waukegan police department arrived at St. Therese Hospital where he was met by Reverend Reyes who told him that defendant wished to talk to the police; Russell was then escorted to a small conference room where defendant was seated at a table. Russell asked the defendant what he wanted to see

the police about and defendant responded that he wanted to confess. Russell asked him what he wanted to confess to; defendant replied that he had killed Michael Rivera. Russell then told defendant that he did not have to say anything more to him, but defendant stated that he wanted to get the matter off of his conscience. Russell thereupon told defendant to relate whatever story he wanted to tell. Then defendant stated as follows: Michael Rivera owed him some money; he and a friend, whom defendant would not name, went to North Chicago and stopped on the route that Rivera took to go to and from work; when Rivera rode by on a bicycle they stopped him, demanding payment of the money; when Rivera refused to pay, Rivera and defendant began fighting; Rivera pulled half of a pair of scissors out of his belt and cut defendant across the back of the hand; defendant got the half of the scissors away from Rivera and stabbed Rivera numerous times; his friend had a weapon, but he didn't know what kind and the friend didn't use it; defendant threw the scissors into the creek nearby; his friend drove him to a hospital in Chicago, and he had his hand stitched. Officer Russell stated that defendant appeared lucid during this conversation.

According to Officer Russell, he had not come to the hospital with the intention of arresting defendant; nor did he subsequently determine to arrest defendant, but that at all times defendant could have ceased talking to him and was free to leave the room at any time. This was not stated to defendant; however, defendant showed no desire to leave the room. It is undisputed that no *Miranda* warnings were given to defendant by Officer Russell during the entire conversation. Thereafter Russell contacted a superior officer and then left the hospital. Defendant was arrested on November 12, 1975.

On November 12, 1975, Melvin Lopez, in the presence of his father and the Lake County State's Attorney gave a taped statement of the events surrounding Rivera's death. According to Melvin, he and his brothers, Benel and Irving, Jose Ramos and defendant met at Washington Park in Waukegan on the evening of August 13, 1975. Defendant started the conversation by suggesting to Melvin that they get some money and that if Rivera didn't pay up, they should kill him; thereupon defendant produced some dismantled scissors. Neither Irving nor Benel wanted to have anything to do with it; nor did Melvin nor Ramos want to participate, but they went along so that defendant wouldn't get into trouble. All five went to North Chicago in defendant's car; the car was then parked under a viaduct; defendant got out of the car first. Michael Rivera rode by on his bicycle, and defendant asked him for money; Melvin then saw Rivera fall to the ground bleeding. Melvin got out of the car and told defendant to leave Rivera alone, but defendant insisted upon killing Rivera. At that point both defendant and Melvin began to stab

Rivera each with half of a pair of scissors, Melvin stabbing Rivera to prevent him from surviving the attack and getting the defendant in trouble. According to Melvin neither Benel nor Irving Lopez nor Jose Ramos took part in the stabbing of Rivera, nor did he see any other weapons used. Melvin dragged Rivera's body into a ditch; he threw his half of the scissors out of the car on the way home; he didn't see what defendant did with his half of the scissors.

At trial, a tape recording of Melvin Lopez' statement was played for the jury while they followed along reading from a written transcript. After Melvin's statement was played to the jury, the trial court instructed them as follows:

> "Ladies and gentlemen of the jury, the statement of Melvin Lopez which you just heard is to be considered by you as evidence only against Melvin Lopez and is not to be considered by you as evidence of guilt against Carlos Frank Colon (the defendant)."

Jose Ramos testified that he had been indicted for the murder of Michael Rivera; but that the charges had been dismissed in exchange for his testimony for the state. According to Ramos, he, Melvin, Benel and Irving Lopez and defendant drove to North Chicago in defendant's car. Defendant stopped the car and stated that he would stop Rivera by pretending he had car trouble and instructed Benel, Irving and Ramos to wait in a tunnel until defendant called them; at that time Benel was holding a butcher knife, defendant and Melvin each a half of a pair of scissors, Irving a crowbar and Ramos a Phillips screwdriver which defendant had handed to him. While Ramos was in the tunnel he observed Rivera ride by on a bicycle and then pass from view. Benel and Irving left the tunnel; after waiting a while Ramos returned to defendant's car. He observed Rivera against the wall in a crouched position bleeding; defendant was holding his own hands which were bleeding and stated that Benel had accidently stabbed him (the defendant). According to Ramos, Rivera said, "Benel, this ain't right what you're doing. Frank, think about it. You're fucking up. You're fucking up." Irving then asked if Rivera had the money right now, and Rivera replied that he didn't but that he could get it. Defendant said, "No, no, forget it" and Benel Lopez said, "Wait a minute, wait a minute, Frank [defendant]," and went to hold defendant back. Defendant slugged Benel and stabbed Rivera in the stomach with half of a pair of scissors. Ramos saw defendant pull away and Irving and Melvin start to stab Rivera. Ramos got back inside defendant's car where he was joined by Benel and defendant and then Melvin and Irving. The group then returned to Benel Lopez' house.

On cross-examination Ramos admitted giving a prior inconsistent statement to the Lake County State's Attorney about his activities prior to going to North Chicago, and where and when the weapons first appeared;

while he testified that he didn't hear the name of Michael Rivera in the park, he did not recall making a contrary statement to the effect that the discussion was held about Michael Rivera that he owed them money and that if he didn't pay they would do something to him.

The first issue on appeal is whether the trial court erred in denying defendant's pretrial motion for severance. The motion for severance alleged that due to statements given by Benel Lopez, (for clarification purposes, we note that two of Benel's statements were suppressed and one was not but was offered at trial) and Jose Ramos, their defenses would be inconsistent with that of defendant's; that Melvin Lopez had given a statement implicating defendant; and therefore defendant requested a severance from the other three co-defendants. (At the time the severance motion was filed but not yet ruled upon Ramos was still a co-defendant.)

■■ In considering a motion for severance, the paramount inquiry for the trial court is whether the defenses are of such an antagonistic nature that a severance is imperative to insure a fair trial; the final decision on the motion is a matter for the trial court's discretion. (*People v. Canaday* (1971), 49 Ill. 2d 416, 275 N.E.2d 356.) In order for defenses to be antagonistic there must be a showing of true conflict in the several defenses. (*People v. Davis* (1976), 43 Ill. App. 3d 603, 357 N.E.2d 96.) Moreover, a showing of antagonistic defenses must be made prior to trial. *People v. Miner* (1977), 46 Ill. App. 3d 273, 360 N.E.2d 1141.

Examination of the statements made by Ramos and Benel reveal that they contain substantially the same story of the events as did defendant's own statement to Officer Russell. However, defendant points out that Melvin's statement in which references to defendant were permitted to remain was introduced at trial, subject only to the trial court's admonishment to the jury that the statement was only to be considered against Melvin and not against defendant. Defendant argues that a confession or admission by one defendant incriminating the other is ground for severance unless the State promises either to avoid introducing the statement into evidence or to delete all references to the other defendant. (*People v. Allen* (1976), 36 Ill. App. 3d 821, 344 N.E.2d 825.) Moreover, generally such an admonishment to the jury by itself has been deemed insufficient to withdraw such evidence from a jury's mind. (See *People v. Sweetin* (1927), 325 Ill. 245, 156 N.E. 354.) However, in that case defendant was implicated by a sole co-defendant, her own prior confession was found to have been coerced, and she took the witness stand and denied all allegations against her.

■■■ Our prime concern in considering this issue is whether defendant was able to receive a fair trial. Defendant's own statement was substantially the same as Melvin's; both Melvin and defendant admitted

stabbing Rivera; neither blamed the other nor in any way denied complicity in the case. Therefore we hold that the trial court did not err in denying defendant's motion to sever inasmuch as there was no showing of a true conflict in the defenses; nor did the admission of Melvin's statement referring to defendant require severance in light of the defendant's own statement and the limiting instruction to the jury.

Defendant next contends that the admission of Melvin Lopez' statement into evidence was error, citing *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620. In *Bruton*, the United States Supreme Court held that the admission in a joint trial of a co-defendant's extra judicial confession which inculpates the other defendant violates that defendant's Sixth Amendment right to confront witnesses against him. Limiting instructions to the jury were found to be an inadequate substitute for the right of cross examination.

However, in *People v. Rosochacki* (1969), 41 Ill. 2d 483, 494, 244 N.E.2d 136, 142, our supreme court stated:

> "* * * It is clear to us that a very substantial difference exists between a case in which a jury hears a co-defendant's statement incriminating a defendant who has himself made similar inculpatory admissions, and the *Bruton*-type case in which the co-defendant's statement is used against a defendant who has made no admissions. In the former case the prejudice to the defendant, if any, is minimal, and entirely insufficient to necessitate retrial, particularly where, as here, defendant's guilt seems clear. * * *"

Defendant's statement to Officer Russell completely inculpates himself, and substantially agrees with Melvin Lopez' statement of the events. Further, the testimony of Jose Ramos which also is substantially similar to defendant's own statement also inculpated the defendant. Here as in *Rosochacki*, defendant's guilt appears clear, and we see minimal, if any, prejudice to defendant in the admission of Melvin Lopez' statement into evidence.

Next, defendant contends that prejudicial error occurred when the State elicited testimony concerning Michael Rivera's children. Pursuant to questions put to her on direct examination by the assistant state's attorney, Claudia Rivera, Michael's common law wife, testified as to the names and ages of the couple's children. Defense counsel objected; the objection was sustained and the jury instructed to disregard any reference to the deceased's family. There was no further mention during the remainder of the trial or in closing arguments.

The admission of testimony in a murder case respecting a deceased's spouse and family not elicited incidentally but presented in such a manner as to cause the jury to believe it is material is highly prejudicial and constitutes reversible error unless an objection thereto is sustained and the

jury instructed to disregard such evidence. *People v. Bernette* (1964), 30 Ill. 2d 359, 197 N.E.2d 436.

■■ We note that the precautions mandated by *Bernette* were taken here, and that no further mention was made of deceased's family to aggravate the original reference. Therefore we find the testimony harmless error. See *People v. Heflin* (1976), 40 Ill. App. 3d 635, 351 N.E.2d 594.

Next, defendant contends that the trial court erred in denying his motion to suppress his confession based on the fact that he did not receive *Miranda* warnings. In denying the motion to suppress the confession, the trial court was of the opinion that defendant's statement to Officer Russell was a spontaneous declaration, freely given by him and therefore not subject to suppression for failure to give *Miranda* warnings.

■■ A trial court's ruling on a motion to suppress should not be reversed unless it is against the manifest weight of the evidence or an abuse of discretion. (*People v. Kelley* (1973), 10 Ill. App. 3d 193, 293 N.E.2d 158.) In *People v. Howell* (1970), 44 Ill. 2d 264, 266, 255 N.E.2d 435, 436, the court stated:

> "* * * It is important to note in the *Miranda* decision that the Supreme Court of the United States did not make all confessions obtained through interrogation inadmissible. The court stated at page 478: 'In dealing with statements obtained through interrogation, we do not purport to find all confessions inadmissible. Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. * * * There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment * * *.' "

Defendant argues that although Officer Russell testified that he was not under arrest and was free to go, it is inconceivable that any police officer would let a man go who had just stated that he wanted to confess to a crime and said, "I killed Michael Rivera." In *Howell*, defendant voluntarily presented himself at a police station and informed an officer he had shot a man and wanted to turn himself in. The court found that in that situation there was no showing that defendant was in custody, and in fact, the *Miranda* decision indicates that volunteered statements of this type are admissible. We are of the opinion that the situation in the case before us is analogous to that in *Howell* and therefore hold that the trial court properly denied suppression of defendant's confession. See also *Oregon v. Mathiason* (1977), 429 U.S. 492, 50 L. Ed. 2d 714, 97 S. Ct. 711.

Finally, defendant contends that his sentence of 25 to 60 years

imprisonment is excessive. Defendant emphasizes his youthfulness (he was 17 years old at the time of the offense) and his minimal past trouble with the law; that he has begun to work out the problems he had in his home life and in functioning in society; and due to his sincere feelings of remorse and contrition, his prospects for complete rehabilitation are good.

■ Imposition of a sentence is a matter of judicial discretion and, absent an abuse of discretion, the sentence of the trial court may not be altered upon review. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) The sentence imposed was within the statutory limits. The trial court indicated that due to the viciousness of the crime, which was borne out by the record, more than a minimum sentence was required. Our own examination of the record reveals no abuse of discretion occurred in the imposition of this sentence on the defendant.

Therefore the judgment and sentence of the circuit court of Lake County is affirmed.

Affirmed.

GUILD, P. J., and LINDBERG, J., concur.