THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, *v.* GARY D. JORDAN, Defendant-Appellee.

Third District   No. 79-772

Opinion filed November 26, 1980.

Carl E. Hawkinson, State's Attorney, of Galesburg (John X. Breslin, of State's Attorneys Appellate Service Commission, of counsel), for the People.

Robert Agostinelli and Verlin R. F. Meinz, both of State Appellate Defender's Office, of Ottawa, for appellee.

Mr. PRESIDING JUSTICE ALLOY delivered the opinion of the court:

In this appeal by the People of the State of Illinois, hereinafter referred to as the State, the order of the Circuit Court of Knox County suppressing a confession by the defendant, Gary D. Jordan, is challenged by the State. An order suppressing the use of certain cannabis seized as evidence is challenged by defendant. At the hearing on the defendant's motion to suppress his confession, the defendant testified that he was arrested in Galesburg on February 15, 1979, on Main Street. He was placed in the squad car by Officer Duncan, the arresting officer, and told to relinquish his driver's license. He was informed that he was under arrest and was subsequently taken to the police station and interrogated. At no time was he given *Miranda* warnings. The total time, from when he was first stopped on the street until he was booked, encompassed about 4 to 4½ hours. The defendant did not recall whether he made any statements during that time, but he did have a conversation with the arresting officer for about one-half hour in the police station.

On cross-examination, the defendant stated that he was not physically abused, beaten, threatened or bribed. The defendant testified that he felt compelled to make a statement to the arresting officer because he was a policeman. On redirect examination, the defendant indicated he was not accustomed to being interrogated by police officers and was

unfamiliar with the procedure. He was "scared" and did not feel well at the time.

The next witness called was the arresting officer, Harold A. Duncan, Jr. He testified that he arrested the defendant in the early morning hours of February 15, 1979, on East Main Street in Galesburg at 2:08 a.m. When he first saw the defendant, the defendant was seated in a car, trying to back it up. Momentarily, he got out of the car and, walking around to the trunk of the car staggering, opened the trunk, took out a shovel and started shoveling the snow from underneath the car. Defendant fell down a couple of times.

The officer pulled the squad car up behind the defendant's car, got out and went to ask the defendant if he was having a problem. The defendant, while he was staggering, "kind of swaying," stated that he had "a gin and tonic trouble." The officer asked for his driver's license, and the defendant fumbled in his billfold and came up with a bond card. The officer told him that he did not need a bond card yet, but needed to see the defendant's driver's license. The defendant "fumbled around for a bit" and again handed the officer a bond card. There was a strong smell of alcohol about the defendant.

Another officer, Officer Pumphrey, arrived on the scene and concurred that the defendant was intoxicated. Officer Duncan then placed the defendant under arrest for driving while intoxicated. He was placed in the squad car and taken to the Public Safety Building in Galesburg.

Once there, he was taken to the "report room" at the station, and when the officer started to take him to a private interview room, the defendant said he had to "spit up." He was taken to a restroom where he emptied his stomach. The defendant was again seated in the report room while the officer went to obtain a breathalyzer form.

At the time, after about 1½ to 2 minutes, the officer noticed a grassy substance on the floor at the feet of the defendant. When the defendant was asked where the substance came from, he said it came from his boots. When the officer told him to take off his boots, the officer noticed a bulge just over where the boots were and reached down and took what appeared to be a grassy substance in a plastic bag from the defendant's right pant leg at about boot level.

The defendant said that he had bought the grass from "a guy named John Santos." The defendant said that the person he had bought the marijuana from sold 200 pounds a week. None of these statements was made in response to questioning. The defendant simply made the statement "out of the blue." He had not been advised of his *Miranda* rights at that time, nor had he been in the interview room at any time up until the time he made the statements.

The officer proceeded to read the breathalyzer form to him and the

defendant consented to take a breathalyzer test. At that time, the defendant went through the breathalyzer test procedure. Then, as was the officer's standard practice, just prior to the alcohol influence form being filled out, he read the defendant the *Miranda* warnings from his standard card. When the defendant was read the *Miranda* rights from the standard police department issued card, the defendant indicated he understood the "rights." He also agreed to answer the questions on the alcohol influence report form.

The defendant stated that he had been to a friend's house and had been "smoking some grass" there and also stated that he had consumed about two water glasses full of gin and tonic. These statements were not made in response to questions on the alcohol influence form, but were offered by the defendant.

On cross-examination, Officer Duncan stated that the procedure in the Galesburg Police Department for the reading of *Miranda* rights is that the reading of the rights is done before beginning questioning that might elicit self-incriminating statements. The officer did not ask the defendant any such questions during the whole period from his arrest until he began with the breathalyzer test. The *Miranda* warnings were read after the breathalyzer test, but before reading of the alcohol influence form. The only questions asked of defendant were those concerning the marijuana, and those questions were asked just prior to filling out the breath analysis form.

In the officer's estimation, the time that elapsed from the defendant's arrest to the reading of the *Miranda* warnings was "probably 15" minutes. The officer then testified that the defendant "threw up" prior to taking the breath test as well as prior to the finding of the marijuana. Upon being questioned about his report, which stated that the breathalyzer test had been interrupted when the defendant became sick, the officer stated that the defendant went to the bathroom twice.

The next person to testify was Officer Ralph Sargeant. He stated that he first came in contact with the defendant in the early morning hours of February 15 in the Public Safety Building in the report writing room. Officer Duncan had been in the room with him and had left the room, so Sargeant stood in the main report writing area to "keep an eye on the defendant."

Officer Sargeant observed the defendant bent over at about the same time Officer Duncan came back into the room. Officer Sargeant said to Duncan that it appeared that the defendant might have thrown up on the floor because he could see something at his feet. Both officers walked into the room with the defendant and saw what appeared to be marijuana loose on the floor and spilling from the boot or pant leg of the defendant.

Officer Duncan said, "What is this?" and reached down. The defendant had on tall boots, and his pant leg was up partially. The officers could see a bulge in his pants. Officer Duncan reached down and pulled out a bag, of plastic, which appeared to be filled with marijuana. Officer Duncan told him to pull his boots off and had him move away, and all the marijuana was gathered up. Officer Sargeant did not recall any conversation at that point. According to Officer Sargeant, Duncan then took the defendant into the main report-writing room, and Sargeant took the collected matter into the lab to weigh it. He then returned to give the marijuana back to Duncan and told him approximately what it weighed. Sargeant was absent from the interrogation room about four or five minutes.

Sargeant did not ask the defendant any questions, because it was Duncan who was handling the interrogation. Sargeant was not present when Duncan gave the defendant the *Miranda* warnings, but he did hear part of the questions and answers on the alcohol influence report form. He also heard part of the breathalyzer request application being given to the defendant.

The defendant, according to Sargeant, did not appear violent or "riled" or angry. In response to a question from Officer Duncan, the defendant stated that the marijuana was purchased from a person at Knox College. As Officer Sargeant recalled, the defendant stated that he had "gotten high earlier at a friend's house," not that he said he was smoking marijuana. This statement was also in response to a question by Duncan regarding where he had been drinking. Sargeant could not recall whether this was before or after the *Miranda* warnings.

After arguments of counsel, the court ruled that it was purely fortuitous that, when the marijuana fell out of the defendant's boot, the officer was "mousetrapped by circumstances," so that when the officer asked where the marijuana came from, the defendant answered that it came out of his boot, but volunteered the rest of the statement. Because of this, the judge believed the motion to suppress should be granted. The trial judge ruled that the officer should have given the defendant the *Miranda* warnings before asking him where the marijuana came from. The trial judge ruled that although the defendant was entitled to a suppression of his confession, the marijuana, as "fruit of the poisonous tree," was also to be suppressed.

After a recess, because the State's Attorney said he was surprised by the fact that the trial judge was also suppressing the marijuana, in addition to the statement, the Assistant State's Attorney asked to put Officer Duncan back on the witness stand. The trial judge stated that because the *Miranda* warnings were not given, the admission of the marijuana as evidence would "be just plain error."

In response, the Assistant State's Attorney made an offer of proof that Officer Duncan would testify that the defendant had not been booked when the marijuana was discovered and that the booking procedure would have included a complete search of his person which would have discovered the marijuana. The trial judge, however, stated that the fact that the defendant would have been searched as a matter of course later on was not significant.

Officer Duncan was recalled to the witness stand. He testified that at the time the defendant was in the interview room he had not been booked, but that he subsequently was. The officer testified that this was the routine procedure in all arrest situations. The defendant was processed and "printed" and his picture was taken. His property was also taken. The processing included putting the defendant in a white uniform and taking the clothing that he had on his person from him. All that the defendant wore underneath the white uniform coveralls were his undershorts. An inventory was taken of his personal possessions, including everything which was on his person. That inventory includes everything the defendant has on "right down to his skin." The inventory would also include anything found in his pockets or boots or shoes.

■■ The State argues that the marijuana should not have been suppressed because it would, inevitably, have been discovered in a later search pursuant to normal booking procedures. After an examination of the case law, the defendant concedes the State's point. As a result, the order suppressing the cannabis will be reversed.

The remaining issue is whether the defendant's statements to the police should have been suppressed. The defendant points out, correctly, that his statement that he was having "gin and tonic trouble" did not come within the purview of the defendant's motion for suppression or the trial court's order since it had no relevance to the prosecution for possession of cannabis even though it established probable cause to make the arrest.

■■ As to the remaining statements, we note preliminarily that, unless the trial court's ruling is against the manifest weight of the evidence, that ruling should not be reversed. (*People v. Colon* (1979), 69 Ill. App. 3d 1021, 387 N.E.2d 956.) The ruling in this case is supported by the evidence.

In a recent decision, the United States Supreme Court has stated:

"We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from

the suspect. The latter portion of the definition focuses primarily upon the perception of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation." (*Rhode Island v. Innis* (1980), ___ U.S. ___, ___, 64 L. Ed. 2d 297, 307-08, 100 S. Ct. 1682, 1689-91.)

The defendant's first statement concerning the cannabis was made after Duncan's inquiry into the origin of the substance. Based on *Rhode Island v. Innis*, then, we must reject the State's suggestion that the officer's lack of intent to incriminate was relevant to whether the response was admissible. Since this question was, obviously, reasonably likely to evoke an incriminating response from the suspect, the failure of the police to comply with the *Miranda* safeguards prior to asking the question renders the response inadmissible.

■■ Although it is true, as the State points out, that a police officer is not required to interrupt a spontaneous statement to give warnings of constitutional rights (*People v. Baer* (1974), 19 Ill. App. 3d 346, 311 N.E.2d 418; *People v. Lowe* (1970), 122 Ill. App. 2d 197, 258 N.E.2d 370), a response to a question is not a spontaneous statement. In *People v. Hoffman* (1980), 81 Ill. App. 3d 304, 401 N.E.2d 323, a police officer, after chasing the defendant into his trailer, asked where the gun was. This was held to be interrogation within the meaning of *Miranda*.

In a factual situation very similar to the present case, it has been determined that the totality of the circumstances is irrelevant if the accused, without the benefit of *Miranda* safeguards, answers the question of a law enforcement officer. The factual background to *Harryman v. Estelle* (5th Cir. 1980), 616 F.2d 870, is that the officer, out of surprise and shock, asked "What is this?" when, while searching the defendant, he found a condom containing a white powdery substance tucked under the waistband of the defendant's trousers. The defendant responded, "Oh, you know what it is, it's heroin." The admission of this statement was considered error, although in that case it was considered harmless error.

As for the remaining statements of the defendant, it is the law in Illinois that these too are inadmissible, since the defendant's original confession was unlawfully obtained and the connection between the original and subsequent statements was not so attenuated as to dissipate the taint. See *People v. Taylor* (1965), 33 Ill. 2d 417, 211 N.E.2d 673; *People v. Medina* (1976), 37 Ill. App. 3d 1029, 347 N.E.2d 424, *aff'd* (1978), 71 Ill. 2d 254, 375 N.E.2d 78.

Accordingly, the order of the Circuit Court of Knox County suppressing the defendant's statements is affirmed, while the order of the court suppressing the cannabis is reversed, and this cause is remanded to the trial court.

Affirmed in part; reversed in part and remanded.

BARRY and SCOTT, JJ., concur.